OPINION
{¶ 1} Michael Heath is appealing the judgment of the Montgomery County Court of Common Pleas convicting him of aggravated robbery and sentencing him accordingly.
 {¶ 2} On February 7, 2002, Heath was indicted by the Montgomery County Grand Jury on one count of aggravated robbery, in violation of R.C. 2911.01(A)(1). A bench trial commenced on April 8, 2002, during which the following testimony was presented:
 {¶ 3} On January 1, 2002, Heath's aunt, Sandra Heath[1], was asleep in her one-bedroom apartment in a high-rise retirement apartment building. At approximately 8:30 a.m., Sandra heard someone tapping lightly on her front door. Sandra could hear Heath telling her that "it's Mike" and asking her to open the door. Sandra arose from bed, unlocked the door, and let Heath into her apartment. He asked to borrow twenty-five dollars for cab fare to her apartment and to pay for a prescription that he needed to have filled.
 {¶ 4} Sandra explained to Heath that she did not have the money. Heath persisted, and eventually Sandra agreed to lend him the money. Sandra retrieved cash from her "hiding place," which was inside a trash bag full of clothes. From where Heath was standing, he was able to watch as Sandra counted the money. Sandra handed Heath the money, and Heath stated that he would reimburse her for the loan. Sandra went back to sleep.
 {¶ 5} Approximately forty-five minutes later, Sandra heard Heath tapping on her door again. Sandra testified that she had arisen from her bed, walked to the front door, and unlocked the door to "crack" the door open when Heath had pushed the door open and entered Sandra's apartment. Heath stated that he had wanted to talk to her; Sandra had immediately responded that she had no money. Heath closed and locked the front door but remained in front of the door, blocking Sandra's access. Heath told Sandra to sit on the couch. According to Sandra, she asked why he had locked the door, and Heath again told her to sit on the couch, shoving her in the chest.
 {¶ 6} An agitated and nervous Heath told Sandra that he needed forty more dollars; she told him she had no more money. Sandra arose from the couch and went into the kitchen. She poured herself a glass of water, retrieved her cigarettes, then went back to the couch. Heath continued to beg for the money, asking "Come on, auntie; come on, auntie; come on, auntie." Sandra kept rejecting his request. Heath went into the kitchen for a glass of water. When he returned, he sat in the kitchen chair, and he again began asking Sandra for money. Sandra again said no and asked him to leave. Heath continued begging, but Sandra just ignored him.
 {¶ 7} Sandra's non-responsiveness seemed to frustrate Heath, and finally Sandra told Heath to leave because she was not going to give him any more money. Heath quieted down and then said, "Look at me, auntie." Sandra refused, and Heath stated his request again, this time louder. Sandra stated that she had been about to turn to him and tell him to "get the `H' out" of her house when she had looked at Heath and noticed that he had a kitchen knife in his right hand, down by his side. Sandra stated that, even though Heath had had the knife down at his side, she had believed that he had "meant business" because "his body was puffed up" and because of the look on his face. Heath told Sandra to get up and get all of her money.
 {¶ 8} Sandra responded, "Mike, don't do this. Don't do this to your mother. Don't do this to me." However, Heath responded with a raised voice, "Get up, auntie, I ain't playing." She arose from the couch and went to her bedroom to retrieve the money. Heath was right behind her. Sandra handed her money to Heath, and he counted the money two or three times. Sandra asked Heath if he could return two hundred dollars to her for her to pay her rent; Heath did not respond.
 {¶ 9} Heath pushed Sandra in the chest onto the bed and began wringing his hands. After a few moments, Heath calmed down a little and said, in a softer voice, "Get up, auntie. * * * Put your shoes on and walk me downstairs."
 {¶ 10} Sandra walked Heath outside. She did not notice anyone waiting outside for him. She again asked Heath if he would give her money for her rent, and he gave her back two hundred dollars. Heath then left, thanking his aunt and telling her that he would pay her the money he owed her on Friday.
 {¶ 11} Sandra did not immediately call the police, as she was aware that Heath was on parole and that he would be in violation of his parole if she turned him in for this crime. However, after speaking with her son and her sister, Sandra called the police department. Incidentally, Heath never reimbursed Sandra for the money he took.
 {¶ 12} Heath's story differs somewhat from Sandra's. Heath admitted going to Sandra's apartment the morning of January 1, 2002 and stealing money. Heath claims that he had relapsed and had again been abusing drugs and alcohol. Because of his relapse, he owed forty dollars, including cab fare, to his crack dealer. He stated that he and his dealer had taken a cab to Sandra's apartment building, where he had gone to Sandra's apartment and borrowed twenty-five dollars. Because the whole forty dollars was not produced, his dealer said that was "not acceptable," and again Heath went to Sandra's apartment.
 {¶ 13} He testified that he had not been agitated and that he had not been under the influence of drugs or alcohol at the time. According to Heath, Sandra let him into her apartment, and he did not lock the door or push her in the chest or shoulder area. He explained to her the real reason he needed the money, but she insisted she did not have any more money. He "requested" that the two of them sit and discuss the situation. At some point, he arose from his chair to enter the kitchen for a glass of water and noticed a knife on the counter by the microwave. He picked it up, thinking of the situation when he left the building, but he "came to the conclusion it couldn't protect [him] much" and returned it to the table. He claims that he held the knife for no more than five seconds.
 {¶ 14} Sandra then went into the bedroom, reached into a bag of clothes, and came out with a twenty dollar bill, handing it to him with a look of disgust on her face. He went into the bedroom, reached in, and grabbed the rest of the money. Sandra requested that Heath give her enough money to cover rent for the month, so he gave her back two hundred dollars. Heath then requested that Sandra walk him to the lobby of her building, so he could show her that someone was waiting for him to whom he owed money.
 {¶ 15} On cross-examination, Heath conceded that he had requested money from Sandra while he had held the knife in his hand. He also admitted that he had been "desperate enough" to pick up the knife and ask Sandra for money.
 {¶ 16} The trial court convicted Heath of aggravated robbery in violation of R.C. 2911.01(A)(1) and sentenced him to eight years of incarceration. Heath now appeals that conviction and sentence, asserting two assignments of error.
 {¶ 17} Heath's first assignment of error:
 {¶ 18} "The evidence was insufficient as a matter of law to convict Appellant of the offense of aggravated robbery[.]"
 {¶ 19} In reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the state had proven the essential elements of the crime beyond a reasonable doubt. See State v. Jenks (1991), 61 Ohio St.3d 259,273, 574 N.E.2d 492.
 {¶ 20} An appellate court will defer to the trier of fact on determinations of witness credibility. State v. DeHass (1967),10 Ohio St.2d 230. A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of Jenks, supra:
 {¶ 21} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
 {¶ 22} Heath was found guilty of violating R.C. 2911.01(A)(1), which states:
 {¶ 23} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 24} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.] "
 {¶ 25} Similarly, a deadly weapon is defined by statute as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).
 {¶ 26} Heath argues that the State failed to provide sufficient evidence that the knife was a deadly weapon and that it was possessed, carried or used as a deadly weapon against Sandra. Heath relies on case law which holds that knives are not presumed to be deadly weapons.
 {¶ 27} While Heath is correct that knives are not generally presumed to be deadly weapons, the State must prove beyond a reasonable doubt, either: "(1) that the knife was designed or specifically adapted for use as a weapon, or (2) that the defendant possessed, carried, or used the knife as a weapon." State v. Cathel (1998),127 Ohio App.3d 408, 412. See, also, e.g., City of Columbus v. Dawson (1986), 28 Ohio App.3d 45;State v. Crenshaw (Aug. 3, 2001), Greene App. No. 2000-CA-76.
 {¶ 28} After viewing the evidence in the light most favorable to the State, we believe a rational fact finder could easily find the elements of the crime established. Specifically, we find that the State presented sufficient evidence to support its theory that Heath possessed, carried or used the knife as a weapon.
 {¶ 29} The State produced evidence that the second time Heath had arrived at Sandra's door, he had pushed himself into her apartment when she had opened the door. He then situated himself between the locked door and Sandra. He pushed her on the couch and repeatedly asked her for money. Heath became frustrated by Sandra's non-responsiveness to his requests for money. When Sandra told Heath to leave because she was not going to give him any more money, Heath became quiet and said, "Look at me, auntie." Sandra refused to look at him, and Heath stated his request again, this time louder. Sandra stated that she had then looked at Heath and had noticed that he had a kitchen knife in his right hand, down by his side. Heath told Sandra to get up and get all of her money, and Sandra believed that Heath "meant business."
 {¶ 30} With the knife in his hand down by his side, Heath ordered Sandra with a raised voice, "Get up, auntie, I ain't playing." Sandra retrieved the money and handed it to Heath.
 {¶ 31} Heath then pushed Sandra in the chest onto the bed and began wringing his hands. After a few moments, Heath calmed down and told Sandra to stand up and walk him downstairs.
 {¶ 32} We find that these facts do establish use of the knife as a weapon. We also note that Heath agreed with the prosecutor's account that he had been "desperate enough to pick up a knife while [he] was in [Sandra's] apartment," that he had "requested money" while he had had the knife in his hand, and that Sandra had seen the knife in his hand.
 {¶ 33} Accordingly, the evidence was legally sufficient to sustain the conviction. We overrule Heath's first assignment of error.
 {¶ 34} Heath's second assignment of error:
 {¶ 35} "Appellant's conviction was against the manifest weight of the evidence. "
 {¶ 36} A weight of the evidence argument challenges the believability of the evidence; which of the competing inferences suggested by the evidence is more believable or persuasive. State v.Hufnagle (Sept. 6, 1996), Montgomery App. No. 15563. The proper test to apply to that inquiry is the one set forth in State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717:
 {¶ 37} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."
 {¶ 38} Furthermore, this court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the fact finder lost its way.
 {¶ 39} Heath asserts that his conviction for aggravated robbery was against the manifest weight of the evidence because of the inconsistencies in Sandra's testimony and her "distorted" perception of the situation. We disagree.
 {¶ 40} The State's evidence consisted primarily of Sandra's testimony. At trial, Sandra was questioned extensively on the inconsistencies in her testimony and her statement, which she had given to the police on the day of the incident. After the incident, Sandra spoke to the police officers and stated that Heath had held the knife to her throat or her back. According to Sandra, she "fell to pieces" upon seeing the knife and had been "messed up" and in shock over the stress of the incident, and that was the reason for the inconsistencies.
 {¶ 41} We note that the trial court heard all of the evidence and was able to view the demeanor of the witnesses, and we must defer to the trial court's determination of credibility in this instance. We cannot find that it was patently apparent that the trial court lost its way in crediting Sandra's testimony at trial.
 {¶ 42} Additionally, Heath contends that his testimony at trial was more credible than that of Sandra's because he admitted to stealing Sandra's money to pay for drugs.
 {¶ 43} "The weight to be given the evidence and the credibility of the witnesses are primarily issues to be decided by the trier of fact."State v. Burdine-Justice (1998), 125 Ohio App.3d 707, 716. The trier of fact has the benefit of seeing and hearing the witnesses testify and is in the best position to determine the facts of the case. In re Good
(1997), 118 Ohio App.3d 371, 377. In the present case, the trial court apparently found Sandra's testimony more credible than Heath's, despite Sandra's testimony that she had made inconsistent statements to police officers after the incident had occurred. Further, we have already addressed Heath's arguments regarding the claimed inconsistencies in Sandra's testimony and found them to be unpersuasive.
 {¶ 44} In reviewing this record as a whole, we cannot say that the evidence weighed heavily against a conviction, that the trial court lost its way, or that a manifest miscarriage of justice has occurred. Heath's conviction was not against the manifest weight of the evidence.
 {¶ 45} Heath's second assignment of error is overruled.
 {¶ 46} The judgment of the trial court is affirmed.
BROGAN, J. and WOLFF, J., concur.
[1] To avoid confusion, we will refer to Sandra Heath simply as "Sandra."